**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

Trustees of the Local 813 Insurance Trust Fund   :
et al.,                                                      :

                                              :

                            Plaintiffs,   :    **1:12-cv-6249 (ALC) (HBP)**

      -against-                             :

                                              :    <u>**OPINION & ORDER**</u>

Rogan Brothers Sanitation Inc. et al.,     :

                                              :

                           Defendants.   :

----------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

      Plaintiffs, the Trustees of the Local 813 Insurance Trust Fund (the "Insurance Fund"), the

Local 813 Pension Trust Fund (the "Pension Fund"), and the Nurses and Local 813 Retirement

Trust Fund f/k/a/ Local 813 and Local 1034 Severance and Retirement Trust Fund (the "Nurses

Fund," and together with the Insurance and Pension Funds, the "Funds") commenced this action

in order to recover unpaid contributions and withdrawal liability owed to the Funds by Defendant

Rogan Brothers Sanitation, Inc. ("RBS"). The Trustees have moved separately for an entry of

default judgment against RBS, its owner James Rogan ("Rogan"), and several related companies

owned by Rogan. The Trustees have also moved for summary judgment on their unpaid

contributions and withdrawal liability claims against two other defendants: R&S Waste Services,

LLC ("R&S") as jointly and severally liable with RBS for both unpaid contributions and

withdrawal liability and Joseph F. Spiezio, III ("Spiezio") as personally liable for the unpaid

contributions. Both R&S and Spiezio have filed separate cross motions for summary judgment

as to the claims against them.

      For the following reasons, Plaintiffs' motion for default judgment is granted in part and

denied in part, Plaintiffs' motion for summary judgment is granted in part and denied in part,

R&S's cross motion for summary judgment is denied, and Spiezio's cross motion for summary judgment is granted. The Court finds that default judgment should be entered against RBS as to unpaid contributions and against RBS and the companies in its control group as to withdrawal liability, that R&S is jointly and severally liable with RBS for unpaid contributions and withdrawal liability, and that James Rogan and Joseph Spiezio are not personally liable for unpaid contributions.

## I. BACKGROUND

The parties have submitted briefs, statements of fact and responses pursuant to Local Civil Rule 56.1, declarations, affidavits, and supporting exhibits, which reflect the following factual background.

A. Rogan Brothers Sanitation, Inc.

Plaintiffs are trustees of employee benefit and multi-employer benefit plans within the meaning of the Employee Retirement Income Security Act ("ERISA"). Second Amended Complaint ("SAC") ¶¶ 4-5. The Funds are co-sponsored by the Local 813, International Brotherhood of Teamsters (the "Union") and contributing employers who are parties to collective bargaining agreements with the Union. The Trustees are fiduciaries within the meaning of ERISA and thus have standing to bring this action in such capacity. *Id.* ¶ 5.

Defendant RBS is a private sanitation company in the State of New York that maintained operations, among other locations, at 1014 Saw Mill River Road, Yonkers, New York 10701. Pls. 56.1 Stmt. (ECF No. 156) ¶ 3. RBS is wholly owned by Rogan. SAC ¶ 24. The other related companies—A.R.J.R., ARJR Holding, Finne Carting, Finne Refuse, Saw Mill, and Sprain (collectively, the "Rogan Companies")—are also wholly owned by Rogan and defendants in this suit. *Id.* ¶¶ 12-16, 18 & 24.

2

Each of the Funds is maintained pursuant to an Agreement and Declaration of Trust (the "Trust Agreements"). Pursuant to the Trust Agreements, the Funds have adopted Employer Contribution Collections Procedures (the "Contribution Procedures"), which provide detailed guidelines on the collection of contributions from employers. Huang Decl. ¶ 11, Giglio Decl. ¶ 8. The Contribution Procedures require the Funds to conduct periodic audits to review an employer's contributions to the Funds and upon a determination of delinquency send a notice, the audit findings, and a demand for payment. Giglio Decl. ¶¶ 9-11. The Contribution Procedures also provide that an employer that fails to timely remit contributions will be liable for interest at the rate of 1.5% "per month of each monthly amount due for each month from the date of the underpayment to the date that it is actually paid." *Id.* ¶ 42.

Also pursuant to the Trust Agreements, the Pension and Nurses Funds have adopted Withdrawal Liability Procedures. Huang Decl. ¶¶ 23-24. These procedures provide that if an employer fails to timely pay its withdrawal liability, it will be liable for interest "from the due date until the date on which the payment is made" at the "rate established by the Pension Benefit Guaranty Corporation pursuant to section 4219(c)(6) of ERISA or at prime rate plus 3%, whichever is greater" (*id.* Exs. 16-17 § 10) and also provide that an employer who fails to make timely payment will be liable for liquidated damages equal to "the greater of the interest due or 20% of the principal due" (*id.* Exs. 16-17 § 12).

As signatory to a collective bargaining agreement (the "CBA") with the Union covering an initial period of December 1, 2005 to November 30, 2008 and then extended by a Memorandum of Agreement through November 30, 2011, RBS became responsible for remitting contributions to the Funds for covered work performed by its employees from December 1, 2005 until November 30, 2011, when the agreement expired. Pls. 56.1 Stmt. ¶¶ 4-15; R&S 56.1 Stmt.

(ECF No. 169) ¶ 32. The CBA required RBS to make contributions to the Funds for each week of earnings by those of its employees who were chauffeurs, helpers, or mechanics, or were involved in loading or removing garbage and other waste products ("covered work"). Pls. 56.1 Stmt. ¶ 5. In January 2011, a Vice President of the Union entered into a Memorandum of Agreement (the "2011 MOA") with RBS stating that "the CBAs did not cover [RBS's] drivers and helpers who performed work solely in Northern Westchester County and were domiciled in the Employer's Bedford Hills facility" and that "Article 1 of the CBA has been and is interpreted to cover those employees performing bargaining unit work who are domiciled in Yonkers, which shall cover no fewer than ten (10) chauffeurs." Pls. 56.1 Resp. (ECF No. 178) ¶¶ 394-95. The Trustees allege that RBS failed to contest payroll audit findings of unpaid contributions, failed to remit the contributions that were found owing, and defaulted on the obligations it incurred to make contributions pursuant to a prior settlement agreement with the Funds. From 2007 to 2011, RBS did remit almost a half-million dollars in contributions to the Funds. Id. ¶ 396.

By certified letters dated September 10, 2012, the Pension and Nurses Funds notified RBS that it owed withdrawal liability of $877,498 and $48,597 respectively, and that the first of its monthly installment payments was due on or before November 10, 2012 (the "Assessments"). Pls. 56.1 Resp. ¶¶ 518-19; Huang Decl. Exs. 10-11. When RBS failed to make its first monthly installment payment, both the Pension Fund and the Nurses Fund sent it a certified letter dated November 14, 2012 notifying RBS that it would be declared in default if it failed to cure its non-payment within 60 days. Id. ¶ 520; Huang Decl. Exs. 5-6. When RBS failed to cure its non-payment, both the Pension and the Nurses Fund sent it a letter dated January 16, 2013 declaring RBS to be in default and accelerating its liability. Id. ¶ 521. Neither RBS nor any other entity or individual has ever challenged these assessments or demanded arbitration. Id. ¶ 522.

4

B. Previous Suits Against RBS

On December 23, 2010, the Trustees sued RBS to collect unpaid contributions due under the CBA in *Trs. of the Local 813 I.B.T. Insurance Trust Fund v. Rogan Brothers Sanitation, Inc.*, No. 1:10-cv-09561 (S.D.N.Y.) ("*Rogan I*"). In *Rogan* I, the Trustees sought to recover unpaid contributions, interest, and liquidated damages due and owing since November 2005. On or about January 24, 2011, RBS entered into a settlement agreement with the Funds (the "2011 Settlement Agreement") whereby it agreed to pay the Funds $203,425.30 in unpaid contributions and other fees due through January 2011. R&S 56.1 Stmt ¶ 3; SAC ¶¶ 40-41; Huang Decl. Ex. 7 (Settlement Agreement). After making $77,294 in payments under the 2011 Settlement Agreement, RBS defaulted on its remaining obligations when it failed to make further payments or cure its default. SAC ¶¶ 42-43.

The Funds' auditor conducted an audit of RBS's books and records for the period 2007 to 2009. By letter dated December 27, 2012, the auditor, Dominick Giglio, served his audit findings of RBS's contributions for the period 2007 to 2009, which concluded that RBS had failed to pay contributions for various employees during this period (the "2007-2009 Audit"). Pls. 56.1 Resp. ¶ 404. These findings were based on a review of materials collected by his predecessor during an in-person audit, which included RBS's payroll journals, NYS Form 45S's, print-outs from RBS's payroll system, and his predecessor's handwritten notes. *Id.* ¶¶ 402-05.

The Funds attempted to conduct an in-person audit of RBS's 2010 to 2011 contributions by letters dated January 31 and March 1, 2012. *Id.* ¶ 407. On May 1, 2012, the Trustees filed suit to compel the audit in the matter *Trustees of the Local 813 Insurance Trust Fund v. Rogan Brothers Sanitation, Inc.*, No. 12-cv-3433 (S.D.N.Y.) (*Rogan* II). On August 8, 2012, the Honorable Jesse M. Furman, U.S.D.J., entered an Order and Judgment requiring RBS to submit

to an audit and to pay any delinquencies identified by the audit.

The Funds' auditor conducted another audit based on materials provided by Funds' counsel, which had been turned over in an NLRB proceeding. *Id.* ¶¶ 412-15. By letter dated June 21, 2013, the Funds' auditor notified RBS that it had failed to pay contributions for various employees from January 1, 2010 to November 30, 2011 (the "2010-2011 Audit"). *Id.* ¶ 414.

C. Formation of R&S

In late 2010, Rogan asked his personal friend, Spiezio, for assistance regarding RBS's financial difficulties. R&S 56.1 Resp. (ECF No. 174) ¶ 16-17. Spiezio through Pinnacle Equity Group, LLC ("Pinnacle") loaned $ 850,000.00 to Rogan and RBS, which was secured by collateral in the form of "[a]ll commercial routes, all customer lists, 450 roll off dumpsters, 85 compactors, 800 garbage containers, computers, office furniture, and 20 vehicles."[1] Pls. 56.1 Stmt. ¶ 22-23. Spiezio also told RBS that, in the event of default, Spiezio would "operate the Sanitation [business] as complete satisfaction of the debt owed." *Id.* ¶ 24.

RBS agreed to retain Spiezio Organization, LLC ("Spiezio Org."), wholly owned by Spiezio, as a consultant. Spiezio Org.'s consulting responsibilities included a number of operational and decision-making functions such as negotiating contracts, reviewing internal controls and company policies (*id.* ¶ 19), and bringing in new counsel and accountants (*id.* 30-31). Spiezio managed RBS's labor relations with the Union. *Id.* ¶¶ 35-38, 43. Beginning in February 2011, Spiezio also arranged for and negotiated the payment of contributions to the Funds pursuant to an RBS settlement agreement. *Id.* ¶ 43. As consultant, Spiezio also controlled RBS's finances, reviewed RBS's books and records, and was aware that RBS was not paying contributions for all its employees. *Id.* ¶¶ 25, 28.

---

[1] The parties dispute whether Spiezio wholly owned Pinnacle and whether it had employees. R&S 56.1 Resp. ¶ 22.

In February 2011, Spiezio incorporated R&S, and on March 1, 2011, he submitted a licensing application to the Westchester County Solid Waste Commission (the "Commission") on its behalf. *Id.* ¶¶ 48-49. The application indicated that R&S was jointly owned by Spiezio and Rogan, and that each was an owner, principal manager, and decision-maker for the newly formed company. *Id.* ¶¶ 49-50. According to Spiezio, he certified that Rogan had an ownership interest and managerial role in R&S only because doing so would persuade the Commission to award R&S a permit. *Id.* ¶ 52.

Spiezio was aware that RBS owed millions in sales taxes; judgments were being entered against it and its bank accounts were being attached; and RBS was not paying its contributions to the Funds or to benefit funds sponsored by other labor unions. *Id.* ¶¶ 55-57. Spiezio informed Rogan that he intended to declare Pinnacle's loan in default and to assign RBS's collateral to R&S, which he had created "to take control in the event of a default." *Id.* ¶¶ 60-62. Pinnacle declared the loan to RBS in default. *Id.* ¶ 64. Spiezio then met with Rogan to discuss what collateral Pinnacle would receive. Certain assets of RBS that served as collateral for the loan including loan customer lists, trucks, dumpsters, and other equipment were surrendered to R&S through Pinnacle in full satisfaction of RBS's debt. *Id.* ¶¶ 66-67.

R&S commenced operation in August 2011 as a private sanitation and roll off company, servicing most of RBS's customers. *Id.* ¶ 70. R&S conducted its operations from a yard next door to RBS (and formerly occupied by RBS), and from the same office building that Spiezio had arranged for RBS to house its controller. *Id.* ¶¶ 34, 71-74. At its start, most of its work force were former RBS employees. *Id.* ¶¶ 84-85. R&S also subcontracted sanitation work to RBS until October 2011. *Id.* ¶¶ 94-95. Spiezio also attempted to negotiate a new CBA with the Union. *Id.* ¶¶ 97-98, 101. Moreover, during these negotiations, Spiezio was conscious about

7

withdrawal liability. Between August 1 and November 30, 2011, R&S employees performed 364 weeks of covered work under the terms of the CBA, but failed to remit contributions to the Funds on these employees behalves; consequently the unpaid balance due is now $325,403.20, consisting of $147,132.44 in unpaid contributions, $148,844.27 in accrued interest, and $29,426.49 in liquidated damages. *Id.* ¶ 109.

D. The NLRB Proceedings

In late 2011, the General Counsel for the NLRB filed unfair labor practice charges against RBS and R&S arising out of the discharge of certain Union employees from RBS. *Rogan Bros. Sanitation Inc.*, Nos. 2-CA-065928, JD (NY)-28-13, 2013 WL 3006932 (N.L.R.B. Div. of Judges June 17, 2013), *adopted as modified*, 362 N.L.R.B. No. 61 (2015), *review denied, order enforced sub nom. R&S Waste Servs., LLC v. N.L.R.B.*, 651 Fed. App'x 34 (2d Cir. 2016). The charges were based on the theory that R&S was the single employer, alter ego, and/or successor of RBS.

The NLRB panel adopted the Administrative Law Judge's (the "ALJ") finding that "all four factors of the single employer test support the judge's finding that RBS and R&S were a single employer" from March 1 to the end of the first week in October in 2011.[2] *Rogan Bros. Sanitation Inc.*, 362 N.L.R.B. No. 61, at *1, *9. First, the NLRB found that RBS and R&S shared common ownership because Rogan owned RBS, and Spiezio's licensing application to the Commission identified Rogan as a 50% owner of R&S. *Id.* at *4. Second, the NLRB also

---

[2] The Panel also adopted the ALJ's finding that the CBA was an unenforceable members-only contract and dismissed the unfair labor practices charges against RBS and R&S. 362 N.L.R.B. No. 61 at *1. The ALJ, however, stated that the CBA "may be enforceable in a separate court proceeding as to those employees who were members of Local 813 for whom benefit fund contributions were not made during the life of the contracts, subject to whatever statute of limitations would be applicable in a State or Federal court." *See* 2013 WL 3006932. The NLRB did not consider, and explicitly declined to rule on, the ALJ's findings that R&S was neither an alter ego (based on a lack of common-ownership) nor successor of RBS, reasoning that they were only relevant to the unfair labor practices claims that had been dismissed on other grounds. 362 N.L.R.B. No. 61 at *1. The NLRB panel explicitly overruled the ALJ's finding that there was not common ownership between RBS and R&S. *Id.* at *4.

found that the two companies had interrelated operations and "the absence of an arm's length relationship between [RBS and R&S]." *Id.* at *5-6. Third, it affirmed the finding that Spiezio's control over significant employment matters at RBS as RBS's sole representative in dealing with the Union while simultaneously exercising total control over all employment matters at R&S "amply establishes common control of labor relations." *Id.* at *8. Finally, the NLRB affirmed the finding that the two companies shared common management because Spiezio "'became increasingly involved in the business affairs of [RBS] as the de facto manager of the company,' and eventually 'it was Spiezio, and not James Rogan [who] was running or attempting to run the business of [RBS].'" *Id.* at 8 (quoting the ALJ's findings).

## II. DISCUSSION

### A. Claims Against RBS and the Rogan Companies

1. Standard of Review

Under Fed. R. Civ. P. 55, after the Clerk of the Court enters a Certificate of Default, a district court may, on a motion by plaintiff, enter a default judgment against a defendant who has "failed to plead or otherwise defend." *Labarbera v. ASTC Laboratories Inc.*, 752 F. Supp. 2d 263, 270 (E.D.N.Y. 2010) (quoting Fed. R. Civ. P. 55(a)). Upon default, the defendant is deemed to have admitted all well-pleaded allegations of liability. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). A court, however, must also determine whether the allegations taken as true establish defendant's liability as a matter of law. *Bricklayers and Allied Craftworkers Local 2, Albany N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015). The default does not constitute an admission as to damages. *Greyhound Exhibitgroup*, 973 F.2d at 158. Instead, plaintiff bears the burden of establishing its entitlement to the amount requested. *Trs. of the Local 813 Pension Tr. Fund v.*

*Canal Carting, Inc.*, No. 12-CV-0060 (CBA)(RLM), 2014 WL 843244, at *5 (E.D.N.Y. Mar. 4, 2014). Where a defendant has never appeared in an action, a court may base its determination of damages solely on the plaintiff's submissions. *See Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). A district court must establish "damages with reasonable certainty," but it is under no obligation to conduct a hearing so long as the court ensures "that there was a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997) (citation omitted).

2. Unpaid Contributions

Section 515 of ERISA, 29 U.S.C. § 1145, provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement . . . make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. The Trustees have established that RBS was required to pay contributions for those of its employees who performed covered work under its CBA, SAC ¶ 28; Huang Decl. Ex. 4 (CBA) §§ 17(a)(1), 18(a), 19(a), and that RBS breached this obligation when it failed to pay the required contributions under its CBA, as stipulated to by RBS in the 2011 Settlement Agreement, and further when it failed to pay contributions on behalf of other employees performing covered work from 2007 to 2011. *See Bricklayers and Allied Craftworkers Local 2*, 779 F.3d at 188.

The Trustees seek damages in the amount of $2,461,475.22, which includes $974,064.69 in unpaid contributions, $1,287,770.49 in interest, and $199,640.04 in liquidated damages. Shah Decl. ¶ 52. Section 502(g)(2)(A)-(C) of ERISA, 29 U.S.C. § 1132(g)(2)(A)-(C) sets forth the damages that are recoverable for an employer's failure to remit contributions, including: unpaid

contributions; interest on the unpaid contributions; and "an amount equal to the greater of (i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State Law) of the amount determined by the court [as unpaid contributions]." Courts "may rely on an audit or an auditor's report to prove that defendant employers did not make required contributions to funds." *Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of the Int'l Union of Operating Engineers, Local 15, 15A, 15C & 15D, AFL–CIO v. Eastport Excavation & Utilities Inc.*, 3 F. Supp. 3d 204, 216 (S.D.N.Y. 2014) (internal quotation marks omitted). The Trustees have submitted a declaration by their counsel, a declaration by the Fund auditor, a declaration by the Fund administrator, the CBA, trust agreements, employer contribution collections procedures, the 2011 settlement agreement, audit reports for the relevant two time periods, and other exhibits. *See La Barbera v. Federal Metal & Glass Corp.*, 666 F. Supp. 2d 341, 349 (E.D.N.Y. 2009) (a court can determine damages where a plaintiff files "reasonably detailed declarations and exhibits pertaining to the damages incurred and where the defendants failed to answer or appear in the case"). Courts regularly rely on the findings of an audit in order to calculate damages. *See, e.g.*, *Gesualdi v. Tri-State Solutions, LLC*, No. CV 13-5429 (JS) (AKT), 2015 WL 5604072, at *10 (E.D.N.Y. Aug. 3, 2015); *Trs. of the Plumbers Local Union No. 1 Welfare Fund v. Philip Gen. Constr.*, No. 05 Civ. 1665 (NG) (RLM), 2007 WL 3124612, at *10 (E.D.N.Y. Oct. 23, 2007) (explaining that "the opinion of an auditor is a sufficient basis for an award of a specific amount of damages" if "adequately explained and credited by the Court").

Regarding the 2011 Settlement Agreement, because RBS defaulted on its obligations under the agreement, the Trustees are entitled to collect the outstanding balance of $126,131.30.

SAC ¶ 43; Huang Decl. ¶¶ 13-14 & Exs. 8-9. In accordance with the Contributions Procedures, the Trustees are also entitled to collect interest on the outstanding amount of the unpaid contributions from September 2011 to June 2017 at the rate of 1.5% per month (Huang Decl. Ex. 6 § II(3) & n.1), or $124,043.07 (Shah Decl. ¶ 30). Finally, the Trustees are entitled to collect $30,053.36 in liquidated damages, as the 2011 Settlement Agreement required RBS to pay this amount in the event it defaulted on the agreement. Huang Decl. Ex. 7 ¶¶ 1, 5. In total, Plaintiffs are entitled to recover $280,227.73 in damages pursuant to the 2011 Settlement Agreement.

Regarding the 2007-2009 period, the Trustees have submitted the 2007-2009 Audit. The auditor determined that RBS had failed to pay contributions to the Funds for 260 weeks of earnings in 2007; 498 weeks of earnings in 2008; and 708 weeks of earnings in 2009, Giglio Decl. ¶¶ 23, 39 & Ex. 14, and multiplying these amounts by the applicable contribution rates set forth in the CBA results in an outstanding balance of $462,520.75. *Id.* ¶¶ 39-42 & Ex. 14. The Trustees are entitled to collect this balance and, pursuant to the Collections Procedure, interest on the unpaid contributions at the rate of 1.5% per month, or $707,139.93. Huang Decl. Ex. 6 § II(3) & n.1; Giglio Decl. ¶ 42 & Ex. 14. Finally, in accordance with the CBA, the Trustees are entitled to recover 20% of the unpaid contributions as liquidated damages, or $92,504.15. Huang Decl. Ex. 4 § 22(d); Giglio Decl. ¶ 41 & Ex. 14. Upon review of pertinent exhibits, the Court finds that the Trustees are entitled to recover $1,262,164.83 in damages on this claim.

Regarding the 2010-2011 period, the Trustees have submitted the 2010-2011 Audit. The auditor determined that RBS had failed to pay contributions to the Funds for 668 weeks of earnings in 2010 and 354 weeks of earnings from January to November 2011, Giglio Decl. ¶¶ 28-34 & Exs. 10-13, and multiplying these amounts by the applicable contribution rates set forth in the CBA results in an outstanding balance of $385,412.64. Giglio Decl. ¶¶ 39-42 & Ex. 14.

In accordance with the Contribution Procedures, the Trustees are entitled to collect this balance, plus interest on the unpaid contributions at the rate of 1.5% per month, or $456,587.49. Huang Decl. Ex. 6 § II(3) & n.1; Giglio Decl. ¶ 42 & Ex. 14. Finally, in accordance with the CBA, the Trustees are entitled to recover 20% of the unpaid contributions as liquidated damages, or $77,082.53. Huang Decl. Ex. 4 § 22(d); Giglio Decl. ¶ 41 & Ex. 14. Upon review of pertinent exhibits, the Court finds that the Trustees are entitled to recover $919,082.66 in damages on this claim.

Accordingly, the Court has credited the findings of the audit reports and finds that the Trustees are entitled to an award of $2,461,475.22 on their unpaid contributions claims.

3. Withdrawal Liability

Under ERISA, when an employer permanently ceases to have an obligation to contribute to a multiemployer pension plan, it is required to pay withdrawal liability in the amount corresponding to its share of the plan's unfunded vested benefits. ERISA § 4201, 29 U.S.C. § 1381(a). ERISA requires that employers wishing to defend claims for withdrawal liability must do so by demanding arbitration within prescribed time limits following receipt of the withdrawal liability assessment; an employer who fails to do so in a timely manner is "barred from challenging [the fund's] calculation of the amount of unpaid withdrawal liability." *Trs. of Local 531 Pension Fund v. Flexwrap Corp.*, 818 F. Supp. 2d 585, 590 (E.D.N.Y. 2011).

The Trustees seek withdrawal liability, and their allegations in the complaint suffice to establish such liability. RBS's obligation to contribute to the Pension and Nurses Funds permanently ceased upon the expiration of its CBA with the Union as of December 1, 2011, and this resulted in the assessments of withdrawal liability by the Pension and Nurses Funds. SAC ¶¶ 111, 122. RBS was properly notified of their demand for withdrawal liability and failed to

either initiate arbitration or make the required monthly liability payments. RBS's failure to initiate arbitration results in its waiver of the right to contest the withdrawal liability assessment calculated by the Funds. *Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 263 (2d Cir. 1990). Additionally, RBS's failure to make payments results in the acceleration of its payment obligation and the amount becomes immediately due and payable in lump sums. *See Div. 1181 Amalgamated Transit Union-New York Emps. Pension Fund v. D & A Bus Co.*, 270 F. Supp. 3d 593, 609 (E.D.N.Y. 2017); 29 U.S.C. § 1399(c)(5).

The Trustees also seek to collect interest and liquidated damages on the unpaid withdrawal liability pursuant to ERISA § 502(g)(2)(B)-(C), 29 U.S.C. § 1132(g)(2)(B)-(C). The Funds have adopted Withdrawal Liability Procedures allowing them to recover interest "from the due date until the date on which the payment is made" at the "rate established by the Pension Benefit Guaranty Corporation pursuant to section 4219(c)(6) of ERISA [29 U.S.C. § 1399(c)(6)] or at prime rate plus 3%, whichever is greater." Huang Decl. Exs. 16-17 § 10. These procedures also allow the Funds to recover liquidated damages equal to "the greater of the interest due or 20% of the principal due." Huang Decl. Exs. 16-17 § 12. Pursuant to the calculation method set forth in 29 C.F.R. 4219.32, the Trustees are entitled to collect $273,682.87 in interest accruing on the assessments from November 10, 2012 (the date on which the first payment was due) to June 27, 2017. Shah Decl. ¶¶ 45-47, 49, 51. Because this amount exceeds 20% of the outstanding amount of withdrawal liability, the Trustees are also entitled to $273,682.87 in liquidated damages. Shah Decl. ¶¶ 48, 50-51.

Accordingly, the Court awards $1,473,460.74, which amount includes $926,095 in withdrawal liability, $273,682.87 in accrued interest, and $273,682.87 in liquidated damages.

4. Common Control Liability of Rogan Companies

The Trustees also seek to establish joint and several liability against A.R.J.R., ARJR Holding, Finne Carting, Finne Refuse, Saw Mill, and Sprain under a theory that all these entities are members of RBS's control group. For purposes of withdrawal liability, "[a]ll trades or businesses under common control are treated as a single employer for the purpose of collecting withdrawal liability, and each is jointly and severally liable for the withdrawal liability of another." *Div. 1181 Amalgamated*, 270 F. Supp. 3d at 610 (citing 29 U.S.C. § 1301(b)(1)). In conducting this inquiry, courts are to be guided by "regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26." 29 U.S.C. § 1301(b)(1).

The Trustees have alleged that Rogan wholly owns RBS, A.R.J.R., ARJR Holding, Finne Carting, Finne Refuse, Saw Mill, and Sprain. SAC ¶ 24. These allegations suffice for establishing that these entities are members of RBS's control group. *See UNITE Nat'l Ret. Fund v. Veranda Mktg. Co.*, No. 04 Civ. 9869 (BSJ), 2009 WL 2025163, at *5 (S.D.N.Y. July 13, 2009) (where an individual was the sole owner of various businesses, those businesses were a "brother-sister" group under the individual's common control). Therefore, these Defendants are jointly and severally liable for withdrawal liability.

**B. Claims Against R&S**

1. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 761 (S.D.N.Y. 2013);

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that a fact is material if it would "affect the outcome of the suit under governing law"). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

At summary judgment, the moving party has the burden "to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). To defeat a motion for summary judgment, the non-moving party may not simply rely on "conclusory allegations" or "unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "The 'mere existence of a scintilla of evidence' is not sufficient to defeat summary judgment; 'there must be evidence on which the jury could reasonably find for the [non-moving party].'" *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F. Supp. 2d 361, 365 (E.D.N.Y. 2013) (alteration in original) (quoting *Anderson*, 477 U.S. at 252).

2. <u>Construction of the CBA</u>

R&S raises a number of arguments concerning the CBA and RBS's obligation to contribute to the Funds. All of these are without merit; there is an unambiguous obligation to contribute.

First, R&S re-argues that the NLRB's finding that the CBA was an unenforceable members-only agreement under the NLRA collaterally estops the Trustees from seeking to enforce the agreement against R&S for the purposes of recovering unpaid contributions under ERISA § 515. The Court rejected this argument, previously ruling that the NLRB's decision did not collaterally estop the Trustees from arguing that the obligation to contribute to the Funds in the CBA was enforceable. Opinion and Order (ECF No. 97), at 5; *see supra* n.2. In the absence

of any compelling circumstances such as an intervening change of law, the availability of new evidence, or a need to correct a clear error, the ruling remains the same. *See Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC.*, 152 F.R.D. 18, 25 (S.D.N.Y. 1993).

Second, R&S argues that the obligation to contribute in the CBA and modifications is ambiguous and therefore precludes relief. For plaintiffs to prevail on their ERISA collection claim, plaintiffs must demonstrate that the CBA "creates an unambiguous contractual obligation on the defendants to make contributions pursuant to contended provisions." *Trs. of Bricklayers & Allied Craftworkers v. Charles T. Driscoll Masonry Restoration Co., Inc.*, 165 F. Supp. 2d 502, 510 (S.D.N.Y. 2001); *see also DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 653 (2d Cir. 1994) (ERISA § 515 requires contributions only in accordance with the terms and conditions of the Agreement).

To support their argument, R&S points to the recognition clause in the CBA, which it argues is ambiguous for failing to sufficiently define the bargaining unit. The Recognition Clause of the CBA provides that "the Union [is] the sole and exclusive bargaining representative for all chauffeurs, helpers, mechanics and welders of the Employer except those *Employees* not eligible for membership in the Union in accordance with the provisions of the National Labor Relations Act . . . The area of work includes, but not by way of limitation, loading, and/or removing garbage, rubbish, cinder, ashes, waste materials, building debris and similar products." CBA § 1 (emphasis added). The Labor Management Relations Act ("LMRA") provides a definition for who is an employee, excluding, for example, agricultural laborers. *See* 29 U.S.C. § 152(3). The Clause, therefore, excludes those employees that the LMRA would not cover. R&S manufactures an ambiguity where there is none. The reference to the job types and the type of work performed is sufficient to render the Recognition Clause unambiguous. Moreover, R&S's

position is belied by the fact that RBS has previously remitted contributions pursuant to the CBA. Pls. 56.1 Resp. ¶ 396.

Third, R&S argues, despite the CBA containing no geographic restriction, that the January 2011 MOA memorialized the parties' understanding that the CBA was intended to require contributions for RBS employees working in Yonkers, and not for drivers and helpers in RBS's Northern Westchester or Bedford facilities. However, an employer and a union may not retroactively modify the contribution obligation set forth in the CBA. *Malden Mills Indus., Inc. v. ILGWU Nat'l Ret. Fund*, 766 F. Supp. 1202, 1212 (D. Mass. 1991); *see also Kelley v. Workmen's Circle Home & Infirmary Found. for Aged*, No. 92 CIV. 1592 (LLS), 1994 WL 613317, at *2 (S.D.N.Y. Nov. 7, 1994) ("The law does not permit an employer and a union to agree to extinguish retroactively the employer's obligation to contribute to a benefit fund."); *Trs. of the Four Joint Boards Health & Welfare & Pension Funds v. Penn Plastics*, 864 F. Supp. 342, 347-48 (S.D.N.Y. 1994) (finding that employer could not rely on argument that the amendment to the CBA modified or discharged its contribution obligations set forth in the CBA and thereby holding that employer's liability was determined by the CBA, not its amendment). Therefore, the January 2011 MOA cannot narrow the scope of the CBA, which requires that RBS make contributions to the Funds for all drivers, helpers, mechanics, and welders employed by it from December 1, 2005 to November 30, 2011.

3. Liability for Unpaid Contributions

There is a dispute about whether R&S is jointly and severally liable for RBS's unpaid contributions and withdrawal liability under three theories: 1) R&S and RBS as single employer, 2) R&S as alter ego to RBS, and 3) R&S as successor to RBS. The Court finds that R&S is

jointly and severally liable under the single employer doctrine.[3]

Under the single employer doctrine, two nominally distinct enterprises will be joint and severally liable under the CBAs signed by the other when the two act as a "single integrated enterprise." *Lihli Fashions Corp. v. N.L.R.B.*, 80 F.3d 743, 747 (2d Cir. 1996). The NLRB has ruled that R&S and RBS constitute a single employer in order to find R&S liable for unlawful discharge of employees. 362 NLRB No. 61, slip op. at *1,*9, *enf'd*, 651 Fed. App'x 34 (2d Cir. 2016). The finding has preclusive effect under the doctrine of collateral estoppel. *Trs. of ALA Lithographic Indus. Pension Plan v. Quality Color Graphics, Inc.*, No. 99-civ-11795 (JSM), 2001 WL 274266, at *2 (S.D.N.Y. Mar. 20, 2001) (observing that "findings of the NLRB are given preclusive effect if the requirements of collateral estoppel are met").

A finding that two entities are a single employer is insufficient to impose joint and several liability; the employees of the two entities must also constitute a single bargaining unit. *Trs. of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 334 (E.D.N.Y. 2017). In determining whether the employees of two entities constitute a single bargaining unit, courts "look for a 'community of interests' among the relevant employees" and consider "factors such as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange." *Id.* (quoting *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001)). District courts in this Circuit have found that employees of two enterprises "comprise a single bargaining unit [1] where the contributions sought [were] for the same job classification . . . and for the same type of work . . . performed in the same geographical area, [2] where the companies exchanged employees, the working conditions were the same at both

---

[3] The Court declines to consider the other theories in light of this finding.

companies, and the employees performed the same job at both companies," *id.* at 335 (internal citations and quotation marks omitted), and [3] where "the employees of [both companies] overlapped, and the nature of their work was similar, if not identical." *Id.* at 346.

Here, R&S and RBS interchanged employees, and R&S employees continued to do the same type of work as before. There was substantial overlap between the customers that were serviced and the equipment that was used. As the NLRB found, there was operational integration and shared common facilities, equipment, management, and customers. *See Labarbera v. Cretty Enter.*, Nos. 03-6112, 04-5178 (DRH) (ARL), 2007 WL 4232765, at *6 (E.D.N.Y. Nov. 28, 2007) (finding single bargaining unit where there was "operational integration, common supervision, geographical proximity, and employee interchange"). The undisputed facts demonstrate that both companies were a single integrated enterprise and represented an appropriate employee bargaining unit. Accordingly, R&S is jointly and severally liable for the unpaid contributions amount.

Additionally, the Trustees seek to hold R&S liable for an additional amount in unpaid contributions, interest, and liquidated damages on behalf of R&S's employees who performed covered work within the meaning of the CBA. Where a non-union employer is found to be a single employer with or alter ego of a union employer, the non-union employer is liable for contributions for covered work performed by its own employees. *High Performance Floors*, 233 F. Supp. 3d at 346. Consequently, as single employer with R&S and thus jointly and severally liable for unpaid contributions, R&S is also obligated under the CBA to pay contributions for its employees performing covered work during the period the CBA was in effect, as well as interest and liquidated damages in accordance with ERISA § 502(g)(2).

4. Damages for Unpaid Contributions

    a. *2007-2009 Audit*

R&S challenges the calculations for the 2007-2009 Audit as too speculative. Although courts do rely on audits or auditor's reports for assessing damages, *Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of the Int'l Union of Operating Engineers, Local 15, 15A, 15C & 15D, AFL–CIO v. Eastport Excavation & Utilities Inc.*, 3 F. Supp. 3d 204, 216 (S.D.N.Y. 2014), courts still "must examine whether the assumptions and techniques relied upon by the auditors were reasonable, or rather rendered the Plaintiffs' audit simply 'too speculative to support a finding' of damages." *Mason Tenders Dist. Council Welfare Fund v. M.A. Angeliades, Inc.*, No. 05 Civ. 8211 (LBS), 2007 WL 4208587, at *4 (S.D.N.Y. Nov. 20, 2007) (quoting *Mastrandrea v. Nassau Land Improvement Co., Inc.*, 182 F.3d 900 (2d Cir. 1999)). Once a court finds that an audit is sound and thus concludes that the [funds] have established a *prima facie* case that defendants owe unpaid contributions in a certain amount, "the burden shifts to [defendants] to come forward with evidence of the precise amount of work performed or evidence that the assumptions underlying the audit are incorrect." *Eastport*, 3 F. Supp. 3d at 216 (internal quotation marks omitted); *see also Moore v. Navillus Tile, Inc.*, 276 F. Supp. 3d 110, 166 (S.D.N.Y. 2017).[4] As noted earlier, the Court found that the Trustees have met their *prima facie* burden. *See supra* II.A.2.

R&S argues that the calculations for 2007-2009 are too speculative because the Funds' current auditor did not personally conduct the audit. However, Giglio's predecessor, Gil Hodes,

---

[4] The Second Circuit has not addressed whether this burden-shifting rule originating with *Combs v. King*, 764 F.2d 818 (11th Cir. 1985) "applies in ERISA cases where an employer has not maintained records sufficient to determine whether a CBA covers a given employee's work at a particular time." *See Reilly v. Reem Contracting Corp.*, 380 Fed. App'x 16, 20 (2d Cir. 2010).

conducted an in-person audit of RBS for the 2007 to 2009 period, which was subsequently

revised by Giglio. Pls. 56.1 Resp. ¶ 246; *see* Giglio Decl. ¶¶ 17-23. R&S does not challenge any

of the assumptions and techniques used by the previous Auditor, who reviewed payroll records,

Form NYS-45's, cash disbursement records, general ledgers, vendor invoices, IRS Form 1099's,

and contributions records to the Funds, and thus fails to meet its burden. *See Eastport*, 3 F.

Supp. 3d at 216. Accordingly, the calculations for 2007 to 2009 are not too speculative to

support an award of damages.

      b. *2010-2011 Audit*

      R&S argues that the Trustees' default judgment against RBS in *Rogan* II for an audit and

payment of unpaid contributions for the period January 1, 2010 through December 31, 2011

precludes recovery against it here, relying on the doctrine of *res judicata*. An action is barred by

*res judicata* if "(l) the previous action involved an adjudication on the merits; (2) the previous

action involved the [same parties] or those in privity with them; [and] (3) the claims asserted in

the subsequent action were, or could have been, raised in the prior action." *Monahan v. New*

*York City Dep't of Corrections*, 214 F.3d 275, 285 (2d Cir. 2000).

      Here, *res judicata* does not apply because the issue here concerns joint and several

liability. In *Rogan* II, Judge Furman ordered RBS to submit to an audit and pay all delinquent

contributions identified by the audit. Here, the claim asserted against R&S involves whether

R&S as single employer, alter ego, or successor to RBS is liable for RBS's unpaid contributions.

Courts have not applied *res judicata* in a new suit where the issue involves whether the new

defendants are jointly and severally liable under any applicable theory for claims of unpaid

contributions or withdrawal liability. *See Bd. of Trs. of the Auto. Mechs. Local No. 701 Union &*

*Indus. Pension Fund v. Moroni*, 905 F. Supp. 2d 846, 850-51 (N.D. Ill. 2012) (default judgment

against employer for withdrawal liability did not bar multiemployer fund's subsequent suit against new defendants, who were alleged to be members or the employer's control group or its common law successor or alter ego); *Trs. of Sheet Metal Workers Local No. 1 Welfare Trust v. Pekin Climate Control, Ltd.*, 669 F. Supp. 2d 924, 930 (C.D. Ill. 2009) (judgment entered in favor of trustees of multiemployer fund against employer for unpaid contributions did not bar subsequent action to collect the amount from an alleged alter ego); *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Gotham Fuel Corp.*, 860 F. Supp. 1044, 1053 n.12 (D.N.J. 1993) (observing that in a withdrawal liability action under a control group theory, where liability is joint and several, "plaintiff can sue one or more defendants, separately or together, at the plaintiff's option").

As to the damages, R&S also argues that the calculations for 2010 to 2011 are too speculative because Giglio did not conduct an in-person audit but instead prepared an audit based on documents given to him by Jane Barker, the Funds' previous counsel. R&S neglects to note that RBS refused to allow Giglio to conduct an in-person audit, which prompted the *Rogan* II action. Pls. 56.1 Resp. ¶¶ 407-410. RBS's refusal to allow an in-person audit is akin to an employer's failure to keep adequate records of the employee's hours because "[e]mployers have an affirmative duty to furnish benefit plans the information needed for the plans' fulfillment of their reporting duties." *Eastport*, 3 F. Supp. 3d at 214 (internal quotation marks omitted); *see also La Barbera v. J.D. Collyer Equipment Corp.*, 337 F.3d 132, 136–37 (2d Cir. 2003). The onus, therefore, is on R&S to come forth with evidence challenging the amount produced by the audit. *See Eastport*, 3 F. Supp. 3d at 216. R&S has neither produced any evidence showing the precise amount of work performed nor has it produced any evidence that the assumptions underlying the audit are incorrect. The most R&S has done is to point out that there is no certain

way to know if the assumptions behind the audit are accurate, but this is insufficient to meet its burden to come forth with evidence that they are, in fact, wrong, when it is RBS's own fault that an audit was not done with the actual records. *See Trustees of Chicago Plastering Institute Pension Fund v. R.G. Const. Services, Inc*, No. 05 C 5669, 2009 WL 1733036, at *11 (N.D. Ill. Sept. 30, 2009) (refusing to reject auditor's findings based on incomplete information and certain assumptions where employer was at fault for not keeping records). "The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance of the requirements of [ERISA]." *Brick Masons Pension Trust v. Indus. Fence & Supply Co.*, 839 F.2d 1333, 1338-39 (9th Cir. 1988) (quoting *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 688 (1946)) (addressing ERISA); *Laborers' Pension Fund v. Loucon Const.*, No. 98 C 6227, 2004 WL 2538298, at *7 (N.D. Ill. Sept. 28, 2004) ("Where the fact of damage is certain, but the calculation of damages is uncertain due to an employer's violation of a statute's requirement to maintain records, the rule that prohibits recovery of speculative damages does not apply.").

5. Withdrawal Liability

Concern about the financial stability of multiemployer pension plans led Congress to enact the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. § 1381 et seq. (1982) amending ERISA to provide for withdrawal liability: "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined . . . to be the withdrawal liability." *Korea Shipping Corp. v. New York Shipping Ass'n-Int'l Longshoreman's Ass'n Pension Fund,* 880 F.2d 1531, 1536 (2d Cir. 1989) (citing 29 U.S.C. § 1381(a)). The Trustees have moved for summary judgment (and Defendants cross-move for summary judgment) on the issue of withdrawal liability for R&S.

"In order to prevail on summary judgment, a plaintiff must establish three elements: "(1) that defendants constituted an 'employer' under MPPAA prior to the withdrawal; (2) that defendants received notice of a withdrawal liability assessment against them; and (3) that defendants failed to initiate arbitration as required by MPPAA." *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F. Supp. 2d 361, 366 (E.D.N.Y. 2013).

R&S disputes its status as employer, arguing that withdrawal liability cannot be based on single employer status. The MPPAA does not define the word employer, but the Second Circuit has defined employer as one that is "obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Korea Shipping Corp.*, 880 F.2d at 1537. Because the contractual relationship between the employer and the union is the basis of the obligation, both the single employer and alter ego theory applies because both theories essentially allege that the signatory of the collective bargaining agreement and the non-signatory are "essentially the same entity."[5] *Burke v. Hamilton Equipment Installer, Inc.*, No. 02–CV–519, 2006 WL 3831380, at *10 (W.D.N.Y. Oct. 16, 2006) (contemplating withdrawal liability for entity under the alter ego and single employer theories) *aff'd*, 528 F.3d 108 (2d Cir. 2008) (per curiam). Thus, courts have held parties secondarily liable under single employer, alter ego, and successor theories.[6] *See, e.g.*, *Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 289 (2d Cir. 2010) (holding alter ego liable for withdrawal liability); *Ferrara v. Smithtown Trucking Co., Inc.*, 29 F. Supp. 3d 274, 283-85 (E.D.N.Y. 2014) (finding that trustees of multiemployer benefit fund sufficiently alleged that entities were a single employer

---

[5] Although conceptually different, the theories have the same binding effect on a non-signatory. *See Brown*, 250 F.3d at 128 n.3.

[6] It is worth noting that single employer, alter ego, and successor theories of liability are essentially forms of veil piercing under federal common law. *Burke*, 2006 WL 3831380, at *10; *Trs. of the Plumbers Local Union No. 1 Welfare Fund v. Enobrac Plumbing, Inc.*, 17-CV-2846 (DLI) (SJB), 2018 U.S. Dist. LEXIS 23658, at *24 (E.D.N.Y. Feb. 12, 2018).

and/or alter egos and thus jointly and severally liable for withdrawal liability).[7] Accordingly, R&S can incur withdrawal liability as employer under the single employer doctrine.

It also does not matter that R&S was a single employer from March 2011 to October 4, 2011, two months before withdrawal. In a withdrawal liability action, a multiemployer fund need only establish that the defendant "at some point prior to the withdrawal[] qualified as an 'employer.'" *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Canny*, 900 F. Supp. 583, 590. 592 (N.D.N.Y. 1995). Accordingly, the Trustees have met the first element and demonstrates that R&S is an employer.

As for the second element, the Trustees have met this as well. It is undisputed that the Trustees notified RBS of withdrawal liability in September 2012. R&S itself was never served with notice, but it was together with RBS a single employer so "any dispute concerning notice of amount of withdrawal liability shall be resolved through arbitration." *Bowers*, 901 F.2d at 262. In any case, R&S did have notice of RBS's potential withdrawal liability on several occasions prior to October 2011, during which it was found to be a single employer with RBS.

Finally, the Trustees have met the third element. It is undisputed that neither RBS nor R&S initiated arbitration regarding withdrawal liability. The failure to arbitrate means that R&S cannot challenge the calculation of the amount of the unpaid withdrawal liability. *See Labarbera v. United Crane & Rigging Services, Inc.*, No. 08 Civ. 3274, 2011 WL 1303146, at *5 (E.D.N.Y. Mar. 2, 2011) ("an employer's failure to arbitrate or dispute the plan sponsor's calculation in the face of proper notification will result in the court's adoption of the sum proffered by the plan,

---

[7] R&S relies on a footnote in *Trs. of the Local 813 Pension Trust Fund v. Metro Cadillac Livery Servs.*, 14 CV 3521 (DLI) (CLP), 2016 U.S. Dist. LEXIS 16701, at *22, n.13 (E.D.N.Y. Feb 2, 2016) stating that "courts in this circuit have only applied the common control doctrine to withdrawal liability." First, this is not the case. Second, even if courts have just applied the common control doctrine to withdrawal liability, but not the single employer doctrine, it does not preclude the possibility that an employer can be held liable under a single employer, alter ego, or successor theories.

even in the absence of documentation as to how the figure was calculated" (citations omitted)).

R&S's remaining challenges to withdrawal liability are, thus, waived because of the failure to arbitrate. R&S contends that withdrawal liability cannot be imposed because RBS did not cease operations in December 2011, but this dispute over whether withdrawal liability was actually triggered is within the purview of an arbitrator. *New York State Teamsters Conference Pension & Retirement Fund v. Express Services, Inc.*, 426 F.3d 640, 645 (2d Cir. 2005) (citing 29 U.S.C. § 1401(a)). Accordingly, employers who wish to challenge an assessment of withdrawal liability must do so through a mandatory system of arbitration. *Nat'l Integrated Grp.*, 938 F. Supp. 2d at 366. The employer's failure to initiate arbitration "waives its right to arbitration and its right to assert any defenses in an action seeking withdrawal liability" and thus fixes the withdrawal liability assessed against it. *Id.* (citation omitted). R&S is incorrect to state that an employer is not obligated to arbitrate any dispute regarding withdrawal liability where it disputes its status as an employer. *See Cardone Realty Corp. v. Teamsters Pension Fund of Philadelphia & Vicinity*, 99 B.R. 202, 205 (W.D.N.Y. 1989) (holding corporation that "gambl[ed] that it would not later be found a member of the control group" waived the right to dispute withdrawal liability when it failed to initiate arbitration and thus waived its defenses). This is in part why the "law is unforgiving." *Labarbera*, 2011 WL 1303146, at *5.

In conclusion, R&S is jointly and severally liable with RBS for unpaid contributions and withdrawal liability.

### C. Claims Against Rogan and Spiezio

1. <u>Governing Law</u>

The Trustees seek to hold both James Rogan and Joseph Spiezio personally liable for RBS's unpaid contributions. The Second Circuit has "recognized that special circumstances,

beyond an individual's officer status or corporate duties, might warrant the imposition of personal liability for a corporation's ERISA obligations." *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir. 1993). These special circumstances include "(1) knowingly participating in a fiduciary's breach of ERISA trust obligations; (2) conspiring to divert ERISA funds for personal benefit; (3) intermingling personal and corporate assets; (4) engaging in fraudulent conduct; or (5) where the individual is in fact the corporation or the corporation's alter ego." *Trs. of Bldg. Serv. 32B-J Pension, Health & Annuity Funds v. Hudson Serv. Corp.*, 871 F. Supp. 631, 638 (S.D.N.Y. 1994) (citing *Sasso*, 985 F.2d at 50-51). As a general federal policy matter, courts will pierce the corporate veil when necessary in order to protect employee benefits. *Ret. Plan of UNITE HERE*, 629 F.3d at 288.

Federal common law governs whether the corporate veil may be pierced in an ERISA claim, but state law may be used as a reference. *Ferrara v. Oakfield Leasing Inc.*, 904 F. Supp. 2d 249, 269-270 (E.D.N.Y. 2012); *see also Goldberg v. Colonial Metal Spinning and Stamping Co.*, No. 92 Civ. 3721 (JFK), 1993 WL 361672, at *4 (S.D.N.Y. Sept. 14, 1993). The test is a flexible one, and "[t]he general rule adopted in federal cases is that 'a corporate entity may be disregarded in the interests of public convenience, fairness and equity.'" *Goldberg*, 1993 WL 361672, at *5 (quoting *Alman v. Danin,* 801 F.2d 1, 3 (1st Cir. 1986)). Generally, "allegations of fraud or intent to utilize the corporate form for a wrongful purpose would make a stronger case to pierce the corporate veil." *Ferrara*, 904 F. Supp. 2d at 270.

Here, the Trustees proceed on a traditional theory of corporate veil piercing under New York law, which given the flexibility of the federal substantive law, the court may consider. *See, e.g., Trs. of the Sheet Metal Workers Int'l Ass'n Local No. 38 Ins. and Welfare Fund v. Haldean Sheet Metal Fabricators, Inc.*, 15 CV 5979, 2017 WL 5633164, at *7 (S.D.N.Y. Nov. 21, 2017)

(considering veil piercing under New York law); *Goldberg*, 1993 WL 361672, at *7-8 (same).

Under New York law, liability is imposed under this theory where a corporate officer (1)

"exercised complete dominion over the corporation with respect to the transaction at issue" and

(2) "such domination was used to commit a fraud or wrong that injured the party seeking to

pierce the veil." *Trs. of the Sheet Metal Workers*, 2017 WL 5633164, at *7 (quoting *MAG

Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001)).

Courts consider the following factors in determining whether a corporate official

exercised domination over a contributing employer:

> (1) the absence of the formalities and paraphernalia that are part
> and parcel of the corporate existence, i.e., issuance of stock,
> election of directors, keeping of corporate records and the like, (2)
> inadequate capitalization, (3) whether funds are put in and taken
> out of the corporation for personal rather than corporate purposes,
> (4) overlap in ownership, officers, directors, and personnel, (5)
> common office space, address and telephone numbers of corporate
> entities, (6) the amount of business discretion displayed by the
> allegedly dominated corporation, (7) whether the related
> corporations deal with the dominated corporation at arms length,
> (8) whether the corporations are treated as independent profit
> centers, (9) the payment or guarantee of debts of the dominated
> corporation by other corporations in the group, and (10) whether
> the corporation in question had property that was used by other of
> the corporations as if it were its own.

*Trs. of the Sheet Metal Workers*, 2017 WL 5633164, at *7 (citation omitted).

The second prong under veil piercing is met when the plaintiff demonstrates that "the

control was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust

act in contravention of plaintiff's legal rights, and that the control and breach of duty proximately

caused the injury complained of." *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044,

1053 (2d Cir. 1997) (citation omitted). Accordingly, to meet this second prong, the plaintiff

must show "that the domination occurred *for the purpose* of committing a wrong," usually by

"showing that the owner misused the corporate form for his personal ends so as to commit the wrong." *Cordius Trust v. Kummerfeld*, No. 99 Civ. 3200(DLC), 2007 WL 2435156, at *6 (S.D.N.Y. Aug. 29, 2007) (internal citations and quotations omitted); *see also Goldberg*, 1993 WL 361672, at *8 (observing that "the most significant consideration, and one echoed in federal common law, is whether the corporate form is found to be nothing more than a mere shell dominated and controlled by the individuals to carry on their own personal business" (internal quotation marks omitted)).

## 2. Personal Liability of James Rogan

The Trustees seek in their default motion to hold Defendant James Rogan jointly and severally liable for RBS's unpaid contributions.[8] Assuming without deciding that the Trustees' allegations that Rogan "dominated and controlled RBS by having actual and operational control over corporate affairs and decision-making regarding use of corporate assets and payment of corporate creditors" (SAC ¶ 100) are sufficient to establish the first prong of domination, the Trustees, however, cannot meet the second prong. The Trustees allege that Rogan diverted corporate assets to third parties without fair consideration and with intent to hinder, delay, and defraud the Funds. SAC ¶¶ 101-103. By essentially alleging a fraud claim, the Trustees were obligated to plead their allegations with particularity. *Trustees of the Local 813 Insurance Trust Fund v. Rogan Bros. Sanitation Inc.*, 1:12-cv-6249 (ALC), 2016 WL 680820, at *3 (S.D.N.Y. Feb 17, 2016) (ECF No. 97). The Trustees fail to do here.[9] *Id.* Because these allegations lack particularity and are thus insufficient to state a fraud claim, the Trustees' motion for default judgment against Defendant Rogan is denied. *See Gerritsen v. Glob Trading, Inc.*, No. 06-CV-

---

[8] For the purposes of the default judgment motion, the Court considers the allegations in the Complaint to be admitted. *Supra*, II.A.1.
[9] The Court previously dismissed the Trustees' fraud claims for failure to state a claim at the motion to dismiss stage due to not pleading those claims with particularity. ECF No. 97.

3756 (SLT)(RLM), 2009 WL 262057, at *7 (E.D.N.Y. Feb. 4, 2009) (denying motion for default judgment on plaintiff's fraud claim for failure to state a claim).

3. Personal Liability of Joseph Spiezio

The Trustees seek in their summary judgment motion to hold Spiezio jointly and severally liable for RBS's unpaid contributions. Contrary to Spiezio's assertion, the action is not barred by *res judicata* due to *Rogan* II. The claims differ in both actions: the claim asserted against Spiezio in this suit is whether he is jointly and severally liable for RBS's unpaid contributions under a veil piercing theory. This invocation of *res judicata* is meritless for the same reasons that R&S's *res judicata* argument for non-liability of unpaid contributions was rejected. *Supra*, II.B.4.b.; *see also United States v. Manning Coal Corp.*, 977 F.2d 117, 122 (4th Cir. 1992) (rejecting the application of *res judicata* and the finding of privity because the "essence of joint and several liability is that a creditor may sue one or more of the parties to such liability separately, or all of them together at his option" (internal quotation marks omitted)). Moreover, veil piercing claims like the one here are not subject to the doctrine of *res judicata. See N.Y. Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.*, No. 07 Civ. 8008(RJS), 2010 WL 3958799, at *6 (S.D.N.Y. Sept. 8, 2010) (finding that action to pierce corporate veil to hold individual personally liable for unpaid contributions is not barred by *res judicata*).

As to the merits, the undisputed facts as well as the NRLB findings, to which the Court owes deference to,[10] demonstrate that Spiezio dominated and controlled RBS. Despite being a consultant to RBS and its creditor through one of his companies, Spiezio acted as RBS's de facto principal and manager. It is undisputed that he hired and fired RBS's service providers,

---

[10] *See NLRB v. Pier Sixty, LLC*, 855 F.3d 115, 118 (2d Cir. 2017) (relying heavily on the deference afforded to NLRB factual findings for its decision); *Kulda v. NLRB*, 821 F.2d 95, 98 (2d Cir. 1987) (recognizing the substantial deference afforded to NLRB factual findings in deciding the issue).

instituted personnel and operations changes, managed its labor relations, controlled its financial operations, determined which of its creditors and vendors to pay, and relocated its staff. *See* 362 N.L.R.B. No. 61 at *4-*8. Therefore, the first prong is met. *See Duffy v. Modern Waste Servs. Corp.*, No. 09-CV-0655 (JS)(ARL), 2011 WL 573564, at *6 (E.D.N.Y. Feb. 14, 2011); *Canal Carting*, 2014 WL 843244, at *8 (finding first prong of analysis met when officer "direct[ed] the operations of the company, making management, financial, and employment decisions.").

However, the Trustees fail to meet the second prong. When applying the second prong in the context of an ERISA claim, in the absence of any allegations or evidence of fraud, courts have emphasized that the misuse of the corporate form is for the purpose of avoiding ERISA liability. *See Trs. of Sheet Metal Workers*, 2017 WL 5633164, at *8 (second prong unmet in the absence of evidence that individual defendants were deliberately abusing the corporate form to avoid the corporation's ERISA obligations); *Canal Carting*, 2014 WL 843244, at *8 (second prong unmet in the absence of any allegation that individual kept corporation undercapitalized to avoid corporation's ERISA obligations); *Nat'l Integrated Grp.*, 938 F. Supp. 2d at 378-379 (second prong met where corporation's sole officer and director, after learning of the withdrawal liability amount, misrepresented to the pension fund that the corporation had not withdrawn, while liquidating the corporation and using the proceeds for his own personal expenses and to pay the corporation's other creditors for six months before telling the fund that the corporation had withdrawn). There are no facts showing that Spiezio personally used RBS's corporate funds. By the time he became consultant and made the loan, RBS was already doing poorly financially. The Trustees have not pointed to any facts that Spiezio purposely drove RBS to financial ruin, in order to start R&S without any obligation to contribute to the Funds. Instead, the facts show that Spiezio tried to assist RBS with its financial problems, but upon realizing the hopelessness of the

venture, tried to recoup the proceeds of his loan by starting R&S. Accordingly, there are no facts establishing that Spiezio's actions were taken for the purpose of avoiding ERISA liability. *See Carpenters Dist. Council of Kansas City Pension Fund v. JNL Constr. Co., Inc.*, 596 F.3d 491, 496 (8th Cir. 2010) (reversing summary judgment as to individual liability where it was not definitively established that individual used corporation to avoid paying ERISA contributions).

Moreover, to the extent that the Trustees argue that Spiezio transferred RBS's assets to R&S in order to escape having to pay unpaid contributions, that argument fails because R&S is liable as single employer. In light of R&S's liability, the remedial purpose of ERISA is not being frustrated if Spiezio is not liable. *See Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) ("the remedial thrust of ERISA is not to be frustrated by meticulous emphasis upon corporate form"). Accordingly, Spieizio is not liable for the unpaid contributions.

### III.    CONCLUSION

For the foregoing reasons, the Court disposes of the motions in the following manner: Plaintiffs' default judgment motion is granted as to RBS and the Rogan Companies and denied as to James Rogan. Judgment is entered in the amount of $2,461,475.22 in unpaid contributions (inclusive of interest and liquidated damages) and $1,473,460.74 in withdrawal liability (inclusive of interest and liquidated damages) against RBS and the Rogan Companies. Plaintiffs' summary judgment motion is granted as to R&S and denied as to Spiezio. R&S's summary judgment motion is denied. R&S is thus jointly and severally liable for the default judgment amount. Judgment is also entered in the amount of $325,403.20 (inclusive of interest and liquidated damages) against R&S. Spiezio's summary judgment motion is granted, and Plaintiffs' remaining claim against Spiezio is dismissed.

**SO ORDERED.**

**Dated:  March 28, 2018**
       **New York, New York**

_____
      **ANDREW L. CARTER, JR.**
      **United States District Judge**